```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
```

EVA KRAVAR,

               Plaintiff,

      v.

TRIANGLE SERVICES, INC.,

               Defendant.

```
-----------------------------------------------------------------x
```

06-CV-07858 (RJH)(FM)

**RULE 56.1 STATEMENT**

Defendant, Triangle Services, Inc. ("Triangle") by its attorneys, Bond, Schoeneck & King, PLLC, submit, pursuant to Rule 56.1 of the Civil Rules of this Court, the following statement in support of its motion for summary judgment, listing those facts as to which it contends there are no genuine issues to be tried.

## Background

1.     Triangle is a private corporation, which provides a variety of services (i.e., janitorial, security, building maintenance, aviation services) to various facilities and airlines across the country. (Heller Aff. ¶ 3).

2.     In New York City, Triangle has contracts with a number of office buildings or tenants to whom it provides cleaning services. (Heller Aff. ¶ 3).

3.     Triangle has been and remains a party to a collective bargaining agreement with Local 32B-32J, Service Employees International Union ("Local 32B-32J"). (Exhibit 1; Heller Aff. ¶ 3).

4. The Plaintiff has been a union cleaner since October 1980 having worked for a variety of cleaning contractors. (Heller Aff. ¶ 4).

5. In or about November 1999, Plaintiff transferred to 110 East 59th Street in Manhattan and performed special services as a day matron for one of the tenants in the building, Bloomberg, LLP ("Bloomberg"). Her employer at the time was ABM. (Heller Aff. ¶ 4).

## Triangle and 110 East 59th Street

6. On or about November 1, 2002 Triangle was awarded the cleaning contract for the entire building at 110 East 59th Street in Manhattan. (Heller Aff. ¶ 5).

7. Because Triangle is a union contractor it is required to assume or "inherit" the existing workforce in the building of the predecessor union cleaning contractor. (Heller Aff. ¶ 5).

8. As of November 1, 2002, Plaintiff's employer changed but her job duties remained essentially the same. (Heller Aff. ¶ 5).

9. Similarly, all of the cleaning employees at 110 East 59th Street became employed by Triangle. (Heller Aff. ¶ 5).

10. The supervisor for Triangle at 110 East 59th Street was Avdo Djokovic. (Heller Aff. ¶ 5).

11. Mr. Djokovic is of Albanian national origin. (Djokovic Aff. ¶ 3).

12. There were approximately 48 Triangle employees working at 110 East 59th Street at the end of 2004/beginning of 2005. The 48 employees consisted of day cleaners, night cleaners, security guards, freight operators, etc. (Exhibit 2)

13. Bloomberg was a major tenant at 110 East 59th Street. (Heller Aff. ¶ 7).

14. Bloomberg occupied approximately 11 of the 38 floors in the building. Bloomberg, however, unlike most other tenants, required on its floors additional day staff at this building because of its desire for "special services." (Heller Aff. ¶ 7).

15. These services consisted of matrons (such as Plaintiff) and porters being responsible for maintaining the bathrooms on Bloomberg floors. This included not only cleaning the bathrooms but making sure soaps, lotions, and other products were always available. (Heller Aff. ¶ 7).

16. In addition to the cleaning employees, a number of daytime employees were designated by Bloomberg as "facilities" workers. These individuals were used by Bloomberg to set up conference rooms, move heavy furniture, perform special projects, etc. They also perform vacuuming and mopping when necessary. (Djokovic Aff. ¶ 6, Heller Aff. ¶ 8).

17. In addition to performing services for Bloomberg at 110 East 59th Street, on many occasions these "facilities" employees would be asked by Bloomberg to travel to other buildings throughout New York City where Bloomberg had rented space to assist in a particular project that required moving furniture or setting up rooms. (Djokovic Aff. ¶ 7, Heller Aff. ¶ 9).

18. Plaintiff admitted that these facilities employees were doing heavy work (Kravar Dep., Ex, 17 at p. 41) and that this work was different from the kind of work she performed (*Id.* at p. 39).

19. Of the 48 Triangle employees in the building at 110 East 59th Street, 13 of the employees were designated "Bloomberg" employees, i.e., they worked on floors occupied by Bloomberg during the day. (Exhibit 3; Heller Aff. ¶ 10).

20. Effective November 1, 2005 Triangle no longer performed cleaning services at 110 East 59th Street. (Heller Aff. ¶ 11).

61295.1

### Bloomberg's "Move Out" to 731 Lexington Avenue

21.   In or about late 2004/early 2005 Bloomberg began to move out of 110 E. 59th Street to a *new* building that had been constructed at 731 Lexington Avenue. This new building was to be Bloomberg's headquarters in New York with Bloomberg consolidating many of its operations throughout New York City into one building. (Heller Aff. ¶ 12).

22.   The move out had been anticipated for some time as construction on the building at 731 Lexington was ongoing for years. (Heller Aff. ¶ 12).

23.   Bloomberg signed a "net lease" meaning it would be responsible for everything in the building, *e.g.,* cleaning, air conditioning, etc. (Heller Aff. ¶ 13).

### Staffing of 731 Lexington Avenue With "80% Employees"

24.   Because it was a new building, there was no existing cleaning contractor at 731 Lexington Avenue, the building owner or Bloomberg could have hired a non-union contractor and staffed the building with those individuals. (Heller Aff. ¶ 14).

25.   Bloomberg, the major commercial tenant in the new building, selected Triangle as its contractor for the 22 floors it would be occupying in the building. Because it was a new building, employees would be staffed by "80%" individuals. (Heller Aff. ¶ 14, Lusha Aff. ¶ 4).

26.   Under the collective bargaining agreement, new hires could be paid 80% of the regular employee's contract rate for the first 30 months of their employment. They would also be ineligible for health benefits for the first three months of their employment as well as other benefits. (Exhibit 1, at pp. 74, 76. and 29-30).

27.   The fact that 731 Lexington Avenue could be staffed with "80%" individuals meant that the cost of the cleaning contract was substantially less. This was factored into

Triangle's response to the Request for a Proposal submitted to Bloomberg at 731 Lexington Avenue. This was submitted sometime in 2004. (Heller Aff. ¶ 17).

28. It was originally contemplated that all of the employees hired at 731 Lexington Avenue would be "new" employees who could be paid the lower wage rate. (Heller Aff. ¶ 17, Djokovic Aff. ¶ 5).

29. Morry Heller was personally involved in the bidding process for the cleaning contract sought by Bloomberg for its space at 731 Lexington Avenue. (Heller Aff. ¶ 18).

**Bloomberg's Decision to Transfer Seven Experienced Employees From 110 East 59th Street**

30. After Triangle had submitted its initial bids, *Bloomberg* specifically asked that several employees working at 110 East 59th Street be moved to the new building. (Heller Aff. ¶ 19).

31. In November 2004 Morry Heller wrote to the union delegate, Jeff Abramson informing him that Bloomberg was requesting that particular individuals be sent to 731 Lexington Avenue. (Exhibit 4; Heller Aff. ¶ 20).

32. The fact that Bloomberg selected these individuals was in fact confirmed by Triangle in a letter to Bloomberg on March 17, 2005. (Exhibit 5; Heller Aff. ¶ 21).

33. Bloomberg selected all six facilities workers to work in the building. These included: Edward Ferris, Alex Gerpe, Jorge Gil, Bernard Herasme, Patrick Rodriguez, and Nicholas Rosa. (Djokovic Aff. ¶ 8; Djokovic Dep., Ex. 20 at pp. 54-55; Heller Aff. ¶ 21).

34. The one cleaning person selected by Bloomberg was the forelady at 110 East 59th Street, Maria Placencia. ((Djokovic Aff. ¶ 8; Djokovic Dep., Ex. 20 at pp. 54-55; Heller Aff. ¶ 21).

35. Triangle did not have anything to do with the selection of these particular individuals. (Heller Aff. ¶ 22).

36. It was exclusively Bloomberg's decision as to which, if any employees would move as it would have to pay more. (Djokovic Dep., Ex. 20 at p. 57; Heller Aff. ¶ 22).

37. Plaintiff admitted that she had no knowledge as to who made the decision on which employees would move to 731 Lexington Avenue. (Kravar Dep., Ex. 17 at pp. 113, 114)

38. Plaintiff admitted that she was told in 2005 by Avdo Djokovic that Bloomberg made the selection on which employees could transfer to the new building. (Kravar Dep., Ex. 17 at p. 61).

39. Morry Heller was personally given the names of the individuals by Bob Ulrich, a manager at Bloomberg. (Heller Dep., Ex. 18 at pp. 52-53; Heller Aff. ¶ 26).

40. Ron Godsey and Bob Ulrich at Bloomberg were the individuals who told Avdo Djokovic that Bloomberg wanted the six facilities employees and forelady to move to 731 Lexington Avenue. (Djokovic Dep., Ex. 20 at p. 54; Djokovic Aff. ¶ 6).

41. Neither Mr. Ulrich nor Mr. Godsey was ever deposed by Plaintiff. Plaintiff deposed a more senior executive in the company, Fran Sharp. (Ex. 12).

42. According to Jeff Abramson, the union delegate, "Bloomberg requested those employees." (Abramson, Dep., Ex. 21 at p. 24).

43. At no time did anyone at Bloomberg ever say or even suggest to Heller that the selection process was based on any unlawful criteria, i.e., there were no comments about race, national origin, disability, age, etc. (Heller Aff. ¶ 26).

61295.1

44.     Internal documents subpoenaed from Bloomberg indicate that Triangle was selected as the cleaning contractor at 731 Lexington Avenue primarily because it would allow Bloomberg to utilize its experienced employees from 110 East 59th Street. (Exhibit 6).

45.     Unlike the dozens of other employees who would be working at the building and being paid at the 80% rate, these six facilities employees working at 110 E. 59th Street and Ms. Placencia were asked by Bloomberg to move to 731 Lexington Avenue. Therefore, these individuals were paid at the 100% rate. (Heller Aff. ¶ 28).

46.     Plaintiff (and several others working at 110 East 59th Street) were not selected by Bloomberg to work at this building. (Heller Aff. ¶ 28).

47.     In or about February 2005, Peter Lusha advised Plaintiff and several other individuals that in light of the move out, their positions at 100 East 59th Street would be eliminated. (Lusha Aff. ¶ 5)

### There Was No Discrimination in the Selection of Employees

48.     Plaintiff admitted that she had no facts to support her claims of discrimination. (Kravar Dep., Ex. 17 at p. 116, 138).

49.     Plaintiff claimed that she should have been moved to the new building because she had more seniority. (Kravar Dep., Ex. 17 at p. 60).

50.     Plaintiff further admitted that her union delegate, Jeff Abramson told her that seniority played no role in who was able to work at 731 Lexington Avenue. (Kravar Dep., Ex. 17 at p. 96).

51.     Seniority was not a factor in who was selected to move to 731 Lexington Avenue. (Heller Aff. ¶ 29).

61295.1

52. Of the 13 "Bloomberg" daytime employees working on Bloomberg floors at 110 East 59th Street, 4 of these employees were White and 9 were Hispanic. Seven of these 13 daytime employees were selected by Bloomberg to work at 731 Lexington Avenue. Six of the 7 employees selected were of Hispanic national origin and one was White. (Exhibit 3; Heller Aff. ¶ 31).

53. All of these employees were inherited by Triangle when it took over the contract in 2002. (Heller Aff. ¶ 5).

54. All 6 of the facilities employees were selected to move to 731 Lexington Avenue. (Heller Aff. ¶ 31).

55. Five out of 6 of facilities employees were Hispanic. (Heller Aff. ¶ 31).

56. Of the six daytime employees working on the Bloomberg floors not selected by Bloomberg to move to 731 Lexington Avenue, 3 were Hispanic and 3 were White. (Heller Aff. ¶ 31).

57. Morry Heller indicated that the decision by Bloomberg to bring over the additional facilities people made sense based on Bloomberg's need to hire experienced personnel. (Dep. of Morry Heller, Ex. 18 at p. 54).

58. Avdo Djokovic testified that Bloomberg wanted these individuals because they were experienced. Djokovic Dep., Ex. 20 at pp. 54-55.

59. Plaintiff admitted that the facilities individuals performed completely different jobs than that of Plaintiff. She acknowledged that they "definitely" did heavier work than her. (Kravar Dep., Ex. 17 at pp. 40-41, 64).

60. According to Avdo Djokovic, facilities employees did much heavier work than Plaintiff. (Djokovic Dep., Ex. 20 at p. 26).

61. In a letter to the Union dated November 23, 2004 Morry Heller informed Jeff Abramson that "[t]hese employees, all day staff, are considered "facilities" by Bloomberg and have nothing to do with the cleaning of the building". (Ex. 4)

62. Avdo Djokovic testified that Bloomberg selected Maria Placencia because she was the forelady. (Djokovic Dep., Ex. 20 at p. 57).

63. Plaintiff testified that she never heard any inappropriate remarks from anyone at Triangle about her race or national origin. (Kravar Dep., Ex. 17 at p. 34).

64. Plaintiff testified that Mr. Djokovic always treated her "fairly." *Id.*

### Efforts to Accommodate Plaintiff

65. Under the contract, when there is a move out, the company is only required to find the displaced individual another similar cleaning position. There is no distinction between day and night positions. Plaintiff did not have the right to a day position. (Heller Aff. ¶ 32).

66. The number of day cleaning positions in Triangle is a very small minority of the cleaning jobs — approximately 5%. (Heller Aff. ¶ 35, Lusha Aff. ¶ 11).

67. Day positions are not only scarce but highly coveted positions. (Heller Aff. ¶35).

68. If a day job was open Plaintiff would have no right to that job as positions within the building are bid by *building* seniority. (Heller Aff. ¶ 35, Lusha Aff. ¶ 12).

69. Allowing an outsider from another building to take a daytime position in another building would violate the seniority provisions of the bargaining agreement. (Heller Aff. ¶ 35, Lusha Aff. ¶ 12).

70. After the move out at 110 East 59th Street, there was only one day matron position left in the building. Debra Mitchell, someone who had worked on floors not occupied by

Bloomberg, remained in that position because she had more *building* seniority than Plaintiff (8/1/86 vs. 11/1/99). (Exhibit 2; Heller Aff. ¶ 36).

71. In or about early March 2005 Plaintiff was advised that her daytime position at 110 East 59th Street was eliminated. (Heller Aff. ¶ 37).

72. Plaintiff was offered a night position with the same rate of pay and hours. (Heller Aff. ¶ 37).

73. Under the contract, Triangle was required to find a position for Plaintiff. (Heller Aff. ¶ 37).

74. Under longstanding practice, Triangle would canvas its list of employees and look to the individuals with the least seniority. It would then "bump" the individuals with the least seniority. (Heller Aff. ¶ 37, Lusha Aff. ¶ 6).

75. Alternatively, Triangle would avoid "bumping" anyone by temporarily placing the displaced employee "on route." Essentially, this means that Triangle would temporarily assign the displaced employee to positions which are vacant, i.e., the incumbent employee is sick or on a leave of absence, paying them their full rate, until an opening occurs. Either way the employee is kept whole. (Heller Aff. ¶ 37).

76. Plaintiff was offered a nighttime position but she refused to work at night. (Heller Aff. ¶ 37).

77. On March 25, 2005 Plaintiff was advised in writing that a night position was available to her. (Exhibit 7).

78. Plaintiff declined this opportunity. (Heller Aff. ¶ 38)

79. Plaintiff told Avdo Djokovic that she needed a day job because "she had [a] mother [who was] ill and she lives pretty much in bad neighborhood, so she works in night and

61295.1

she had to walk around 1:30, 2 o'clock in the morning." (Djokovic Dep., Ex. 20 at p. 74; Djokovic Aff. ¶ 11).

80. Plaintiff told Peter Lusha that "she had a sick mother to tend to and it was late when she would get home." (Lusha Dep., Ex. 19 at p. 45). *See also Id.* at 52 ("she told me that she cannot work nights, because she had a mother she had to take care of, she was getting home late in a bad neighborhood"). (*See also* Lusha Aff. ¶ 7).

81. Morry Heller was advised by his day operations manager Peter Lusha that Plaintiff did not want to work at night because (1) her mother was living with her and she needed to take care of her and (2) she lived in a dangerous neighborhood and did not like travelling on the subway at night. (Heller Aff. ¶ 38).

82. Plaintiff confirmed that she had told this to Triangle management (Kravar Dep., Ex. 17 at p. 103-104).

83. Plaintiff refused to accept the nighttime position. (Heller Aff. ¶ 38).

84. Notwithstanding the fact that she had no right to continue working during the day, in an effort to accommodate Plaintiff, the Union, in agreement with Triangle, allowed her to take a leave of absence from March 30, 2005 to April 29, 2005. (Exhibit 8; Heller Aff. ¶ 39; Lusha Aff. ¶ 8).

85. When she returned from her leave of absence there were still no day jobs available. (Heller Aff. ¶ 40).

86. Plaintiff filed a grievance with her union in April 2005. (Exhibit 9).

87. In discussions with the Union, Peter Lusha, on behalf of Triangle, agreed to accommodate Plaintiff by allowing her to work the summer as a vacation replacement. (Lusha Aff. 9).

61295.1

88. The normal vacation period starts in mid April and lasts through the end of August. (Heller Aff. ¶ 41, Lusha Aff. ¶ 9).

89. Triangle offered Plaintiff work throughout the summer at a rate significantly higher than what other vacation replacements received under the contract. (Heller Aff. ¶ 41, Lusha Aff. ¶ 9).

90. Under the contract, vacation replacements earn only 60% of the normal rate of pay of an employee and receive no benefits. (Exhibit 1 at p. 88 ("[a] person hired solely for the purpose of relieving employees for vacation shall be paid sixty percent (60%) of the minimum applicable regular hourly wage rate").

91. As an accommodation to Plaintiff, Triangle, with the consent of the Union, permitted Plaintiff to continue to receive her full rate of pay and receive all benefits while working as a vacation replacement, as if she were a full time regular employee. (Exhibit 10 showing Plaintiff receiving full pay during summer of 2005; Heller Aff. ¶ 42).

92. During the summer of 2005 Plaintiff worked in various buildings as a daytime vacation replacement. (Heller Aff. ¶ 43).

93. By the end of August there still were no daytime positions available and Plaintiff no longer responded to calls from Triangle for per diem work. (Heller Aff. ¶ 43).

94. Peter Lusha made every possible effort to try and find a vacant day job but there were none. (Lusha Aff. ¶¶10-11, Lusha Dep., Ex. 19 at 53, 54).

95. Plaintiff was unable to identify any vacant day jobs within Triangle. (Kravar Dep., Ex. 17 at p. 110)

96. Effective on or about November 2005 Plaintiff was removed from the payroll and her benefits ceased at that time. (Heller Aff. ¶ 43).

61295.1

97. The contributions to the Health fund are made on a quarterly basis. When Triangle's accounting department observed that Plaintiff had not worked since August 27, 2005 contributions to the Fund were not made for the quarter ending December 31, 2005 as Triangle need only contribute for employees who are working. (Exhibit 11 indicating that Plaintiff "last worked 8/27/05"; Heller Aff. ¶ 44).

### Plaintiff's "Disability"

98. At her deposition, Plaintiff testified that she "did not feel disabled" and that "there were lots of job [she] could do but [she wasn't] able to do the night job." (Kravar Dep., Ex. 17 at pp. 18-19).

99. Plaintiff stated she could perform clerical work and that her only restrictions were heavy lifting and vacuuming. (Kravar Dep., Ex. 17 at pp. 104-105).

100. Plaintiff also testified that she drives, and lives in an apartment that requires her to walk up three flights as there is no elevator. (Kravar Dep., Ex. 17 at p. 21). She also reported to her doctor that she walks two to three miles every day. (Ex. 14).

101. Plaintiff's physician wrote a letter on January 9, 2006 stating that Plaintiff could perform "clerical work and other non-strenuous work." (Ex. 13).

Dated: Garden City, New York
August 15, 2008

BOND SCHOENECK & KING, PLLC

By: _____
Mark N. Reinharz, Esq. (MNR 6201)
Attorneys for Defendants
1399 Franklin Avenue Suite 200
Garden City, New York  11530
(516).267-6320

61295.1

CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2008 the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service upon the following parties and participants:

Darnley D. Stewart, Esq.
Giskan, Solotaroff, & Anderson, LLP
11 Broadway, Suite 2150
New York, New York  10004

Mark N. Reinharz (MR6201)
*Attorneys for Defendants*
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
(516) 267-6300
mreinharz@bsk.com

61325.1 8/15/2008