UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA KRAVAR,

              Plaintiff,

       - against -

TRIANGLE SERVICES, INC.,

              Defendant.

1:06-cv-07858-RJH-FM

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      This case lies at the intersection of three schemes governing the defendant's hiring decisions: a union-negotiated collective bargaining agreement, the Americans with Disabilities Act, and Title VII of the Civil Rights Act of 1964.

      Plaintiff Eva Kravar, a daytime office cleaner, was two years away from retiring with full benefits when defendant Triangle Services Inc. ("Triangle") terminated her employment.  The parties do not dispute that Triangle terminated Ms. Kravar because its client, Bloomberg L.P. ("Bloomberg"), moved from its former offices at 110 East 59th Street to its current headquarters at 731 Lexington Avenue.  Nor do the parties dispute that before terminating her, Triangle offered Ms. Kravar a nighttime cleaning position at another office building at her former rate of pay.

      The parties disagree, however, about whether Triangle's seniority rules required it to offer Ms. Kravar a daytime cleaning position at 731 Lexington Avenue—a less demanding job similar to the one Ms. Kravar held at 110 East 59th Street.  Ms. Kravar contends that her seniority at 110 East 59th Street entitled her to a daytime position at 731 Lexington Avenue.  Triangle's refusal to offer her the position, she says, not only

violated the company's seniority rules, but constituted unlawful discrimination based on her disability (limitations resulting from abdominal surgery) and national origin (Slovakian). Triangle contends that Ms. Kravar's seniority at 110 East 59th Street did not entitle her to a daytime position at 731 Lexington Avenue. Moreover, it maintains that the employees transferred to 731 Lexington Avenue were selected because they performed more demanding "facilities" work, such as moving furniture and setting up conference rooms.

Triangle has moved for summary judgment. For the reasons that follow, the motion will be denied as to Ms. Kravar's claims for disability discrimination, but granted in all other respects.

## I.      BACKGROUND

Viewed in the light most favorable to Ms. Kravar, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the record shows the following.

## A.      The Parties

Ms. Kravar is a sixty-two year old woman from the Slovak Republic. (Pl.'s Counter-Statement of Undisputed Facts ¶ 1 ("Pl.'s R. 56.1 Stmt.").) For more than twenty-five years, Ms. Kravar worked as a daytime cleaner at 110 East 59th Street, Bloomberg's former headquarters. (*Id.* ¶¶ 1, 3.) In August 2005, two years before she would have been able to retire with full pension, retirement, and medical benefits, Ms. Kravar's employment was terminated. (*Id.* ¶¶ 1, 2.)

Triangle is a union contractor, which is subject to a collective bargaining agreement entered into by the Service Employees International Union, Local 32BJ, AFL-CIO and The Realty Advisory Board on Labor Relations, Inc. (Ex. 1 to Pl.'s R. 56.1 Stmt. ("32BJ Agreement").) In part, the 32BJ Agreement provides that "In the event of

layoff due to reduction of force, the inverse order of department or job classification seniority shall be followed . . . ." (*Id.* at 71-72.) The agreement additionally provides that subject to exceptions not relevant here, "an employee laid off as a result of reduction in force in a building may bump the employee in the company with the least seniority among employees covered by the respective Building or Route Agreement." (*Id.* at 72.)

**B.      Ms. Kravar's Surgery**

In August 2003, Ms. Kravar was diagnosed with colon cancer. (Pl.'s R. 56.1 Stmt. ¶ 5.) The following month, Ms. Kravar underwent extensive abdominal surgery including a "right hemicolectomy," a procedure in which the right portion of her colon was removed. (*Id.*) After surgery, Ms. Kravar spent a week in the hospital. (*Id.* ¶ 6.) She did not return to work for two more months. (*Id.*)

**C.      Bloomberg's Move to 731 Lexington Avenue**

At the end of February 2005, Triangle told Ms. Kravar that because Bloomberg was moving to new headquarters at 731 Lexington Avenue, she would no longer have a job at 110 East 59th Street. (*Id.* ¶ 10.) In addition, Triangle told Ms. Kravar that all of the cleaning employees at 731 Lexington would be new hires who, pursuant to the 32BJ Agreement, could be paid less than the more senior employees at 110 East 59th Street. (*Id.* ¶ 11; *see* Def.'s R. 56.1 Stmt. ¶¶ 24-26.[1]) Despite this representation, Triangle eventually moved seven employees from 110 East 59th Street to 731 Lexington Avenue.

---

[1] The relevant section of the 32BJ Agreement provides:

> Effective on or after February 4, 1996, a new hire employed in the guard or 'other' category shall be paid a starting rate of eighty percent (80%) of the minimum regular hourly wage rate, and that notwithstanding Article XI Section B, the rates for the thirty month new hire period shall reflect annual increases of 80% of the annual increase.

(32BJ Agreement 74.)

(Pl.'s R. 56.1 Stmt. ¶ 12.)  The parties refer to these employees as "100%" since, unlike the rest of the employees at 731 Lexington Avenue, they received full union wages.  (*Id.*) Of the seven "100%" employees Triangle transferred to 731 Lexington Avenue, six were Hispanic.  (*Id.* ¶ 15.)

The parties dispute how and why Triangle selected the employees that moved to 731 Lexington Avenue.  According to Triangle, all but one of the employees performed "facilities" work such as setting up conference rooms and moving heavy furniture. (Def.'s R. 56.1 Stmt. ¶ 16.)  Triangle further maintains that (1) Bloomberg specifically selected the employees that moved to 731 Lexington (*id.* ¶¶ 30, 40), (2) Triangle had nothing to do with their selection (*id.* ¶ 35), and (3) Triangle had no reason to believe that Bloomberg relied on unlawful criteria (*id.* ¶ 43).  Ms. Kravar concedes that "[a]s Bloomberg moved to its new headquarters, its operations management wanted some 'senior' employees to move over to help make the transition more seamless."  (Pl.'s R. 56.1 Stmt. ¶ 20.)  But she maintains that (1) nothing distinguished the transferred employees from ordinary cleaners (*id.* ¶¶ 27-30), (2) a Cuban woman employed by Bloomberg was involved in the selection process, raising an inference of unlawful discrimination (*see id.* ¶¶ 24-26), and (3) Triangle was involved in a "rating and ranking" process used to determine who would move to the new building (*id.* ¶ 21).

As noted, Ms. Kravar also contends that in failing to offer her a daytime position at 731 Lexington Avenue, Triangle violated the 32BJ Agreement.  (*See id.* ¶¶ 13-16.) Triangle disputes whether the agreement gave Ms. Kravar any rights vis-à-vis 731 Lexington Avenue.  (*See* Def.'s R. 56.1 Stmt. ¶¶ 65-69.)

**D.      Ms. Kravar's Termination**

Things came to a head in early 2005.  By letter dated March 25, 2005, Triangle offered Ms. Kravar a nighttime cleaning position with the company at her former rate of pay.  (*See* Ex. 13 to Pl.'s R. 56.1 Stmt.)  While nighttime work is more physically demanding than daytime work (Pl.'s R. 56.1 Stmt. ¶ 32), approximately ninety-five percent of Triangle's cleaning jobs are nighttime positions.  (Def.'s R. 56.1 Stmt. ¶ 66; *see also id.*, ¶ 67 (daytime jobs "scarce" and "highly coveted").)  In the same letter, Triangle warned Ms. Kravar that if she did not accept a nighttime position, her employment would be terminated.  Ms. Kravar responded by sending Triangle a note from her cancer surgeon, which stated that Ms. Kravar had "weakness of her anterior abdominal wall," and that "heavy work" or "heavy lifting" would be "injurious to her health."  (Ex. 3 to Pl.'s R. 56.1 Stmt.)  On May 2 and May 3, Ms. Kravar attempted to work night shifts at other buildings serviced by Triangle.  (Kravar Depo. 66, Ex. 17 to Def.'s R. 56.1 Stmt.)  Ms. Kravar testified that while was able to perform light work such as cleaning desks, she could not vacuum or perform heaving lifting.  (*Id.* at 66-67.[2])

Over the next few months, Triangle assigned Ms. Kravar to work as a standby for regular daytime workers who were out sick or on vacation.  (Pl.'s R. 56.1 Stmt. ¶ 40.) Peter Lusha, Triangle's Day Operations Manager, also promised Ms. Kravar that he would look for a daytime position for her.  (*Id.* ¶ 41.)  Lusha did not, however, take any steps to locate a daytime position for Ms. Kravar.  (*Id.* ¶¶ 42-43.)  After continued

---

[2] This testimony provides as follows: "The first night they sent me to a building where there was no heavy lifting, no garbage.  We [were] cleaning the desks and preparing the floor for people to move in.  That was fine.  I could do that, but the second night I went to a building where there was lifting, vacuuming and after four hours the supervisor had to send me home."

disputes over whether Triangle was required to offer Ms. Kravar a daytime position, Triangle terminated Ms. Kravar's employment on August 31, 2005.  (*See id.* ¶¶ 44-45, 49.)

### E.    Subsequent Events

On September 20, 2005, Ms. Kravar filed a discrimination charge against Triangle with the Equal Employment Opportunity Commission.  (*Id.* ¶ 50.)  The EEOC sent notice of the charge to Triangle on October 15, 2005.  (*Id.* ¶ 51.)  About three weeks later, Triangle removed Ms. Kravar from its payroll and terminated her benefits.  (*Id.* ¶ 52.)

On May 31, 2006, the EEOC issued a determination finding reasonable cause to be believe that Triangle had (1) discriminated against Ms. Kravar based on national origin; (2) failed to provide Ms. Kravar with a reasonable accommodation for her disability; and (3) retaliated against Ms. Kravar by eliminating her benefits after she filed her EEOC charge.  (*See* Ex. A to Amended Compl., at 2.)  After the EEOC found probable cause and issued a "right to sue" letter, Ms. Kravar filed suit against Triangle on September 29, 2006.  As amended, Ms. Kravar's complaint alleged claims based on the same three theories identified in the EEOC's probable cause determination, i.e., that Triangle discriminated against her on the basis of her national origin, failed to reasonably accommodate her disability, and retaliated against her for filing an EEOC charge. (*See* Amended Compl. ¶¶ 15, 17, 19, 21.)  In addition, the complaint asserted a claim under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (the "NYCHRL"), on the same grounds.  As relief, Ms. Kravar sought injunctive relief, back pay, damages, costs, and attorney's fees.  (*Id.* at 5.)

Triangle moved to dismiss the complaint or stay the action on the ground that under the 32BJ Agreement, arbitration was the "sole and exclusive remedy" available to

Ms. Kravar.  Relying on the Second Circuit's decision in *Pyett v. Pennsylvania Building Company*, 498 F.3d 88 (2d Cir. 2007), *cert. granted*, 128 S. Ct. 1223 (2008), the Court denied Triangle's motion.  (*Kravar v. Triangle Servs., Inc.*, 509 F. Supp. 2d 407 (S.D.N.Y. 2007).)  After discovery, Triangle moved for summary judgment.  In its motion, Triangle contends that the record does not justify trial on any of Ms. Kravar's claims.

## II.    DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To survive a properly supported motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.*

### A.    ADA Claim

The Court first turns to Ms. Kravar's claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 (2006) (the "ADA").

The ADA obligates covered employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  § 12112 (b)(5)(A).  A "qualified individual with a disability" includes someone who is disabled but who, with "reasonable

accommodation," can perform "the essential functions of the employment position that

such individual holds or desires."  § 12111(8).

　　　　To make out a prima facie claim under the Act, a plaintiff must show that:

　　　　(1) her employer is subject to the ADA;

　　　　(2) she was disabled within the meaning of the ADA;

　　　　(3) she was otherwise qualified to perform the essential functions of her
　　　　　　job, with or without reasonable accommodation; and

　　　　(4) she suffered an adverse employment action because of her disability.

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (alteration omitted).  Only

the second and third elements are disputed here.

　　　　*1.　"Disability"*

　　　　Since the actions that form the basis of this lawsuit occurred in 2005, the question

of whether Ms. Kravar is disabled within the meaning of the ADA is governed by *Toyota*

*Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Sutton v.*

*United Air Lines, Inc.*, 527 U.S. 471 (1999), rather than the ADA Amendments Act of

2008, Pub. L. No. 110–325, 122 Stat. 3557 (Sept. 25, 2008) (the "Amendments Act").[3]

---

[3] The Amendments Act provides that "the question of whether an individual's
impairment is a disability under the ADA should not demand extensive analysis."
§ 2(b)(5).  While clearly intended to overrule *Sutton* and *Williams*, the Act provides, in
§ 8, that "[t]his Act and the amendments made by this Act shall become effective on
January 1, 2009."

　　　　In *Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994), the Supreme Court held
that even a "restorative" statute designed to correct the courts' erroneous interpretation of
a defined statutory term is subject to the ordinary presumption against retroactive
application.  For the statute to apply retroactively, there must be "clear evidence" that
Congress intended this result.  *Id.* at 311.  *See also* 1A Norman J. Singer, *Statutory*
*Construction* § 27:4, at 632-33 (2002) ("Where such statutes are given any effect, the
effect is prospective only.  Any other result would make the legislature a court of last
resort.").

　　　　No such evidence appears in the Amendments Act, and if anything, the Act's
effective date provision signals Congress's judgment that the Act's expanded definition
of disability should apply prospectively.  Accordingly, this Court joins other courts that

> The ADA defines "disability" as:
>
> (A) a physical or mental impairment that substantially limits one or more
>     of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102.[4]

In *Sutton*, the Court addressed which "major life activities" are covered by subsection (A). It held that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." 527 U.S. at 491. Applying this definition, the Court held that plaintiffs, myopic pilots who had been denied jobs at United Airlines because of their poor eyesight, were not disabled since other positions that utilized their skills were available. *Id.* at 493-94.

In *Williams*, the Court considered which "impairments" fall within subsections (A) and (B). The Court held that to be disabled, a person must have "an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." 534 U.S. at 198. Applying this understanding, the Court held in the case before it that an employee's inability to perform repetitive work with her hands and arms extended at or above shoulder level was not sufficient to prove that she was substantially limited in the major life activity of "performing manual

---

have held that the Amendments Act's definition of "disability" does not apply to conduct that occurred before January 1, 2009. *See, e.g.*, *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 (5th Cir. 2009); *Moran v. Premier Educ. Group, LP*, — F. Supp. 2d —, 2009 WL 507505, at *7 (D. Conn. Feb. 13, 2009).

[4] The NYCHRL's definition of disability is at least as broad. *See, e.g.*, *Franklin v. Consol. Edison Co. of New York, Inc.*, No. 98 Civ. 2286 (WHP), 1999 WL 796170, at *10 (S.D.N.Y. Sept. 30, 1999).

tasks." *Id.* at 202.  The Court remanded for further proceedings on whether the employee's limitations amounted to a "manual task disability." *Id.*

Triangle contends that Ms. Kravar has failed to make the showing called for by *Sutton* and *Williams*.  Specifically, Triangle contends that because Ms. Kravar drives, lives in an apartment that requires her to walk up three flights of stairs, and can perform a large number of jobs that do not involve heavy lifting, Ms. Kravar is not disabled within the meaning of *Sutton*.  (*See* Def.'s Opening Mem. 16 ("Simply because she could not lift heavy objects or vacuum does not make her disabled.").)  This argument misreads *Sutton*, and overstates Ms. Kravar's burden at summary judgment.

Contrary to Triangle's suggestion, *Sutton* does not require Ms. Kravar to show that she is unable to perform *any* job, but to introduce evidence from which a jury might rationally conclude that she is unable "to work in a broad class of jobs."  *Sutton*, 527 U.S. at 491.  *See Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 83 (2d Cir. 2000) (holding, on remand following *Sutton*, that "it is not necessary that [a plaintiff] be excluded from every job for which she is qualified, but it is also not enough for her to be excluded from only 'one type of job, a specialized job, or a particular job of choice.'" (citations omitted)).  Thus, while Triangle is correct to note that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working," *Zwygart v. Board of County Commr's of Jefferson County, Kan.*, 483 F.3d 1086, 1092 (10th Cir. 2007), it is mistaken in arguing that Ms. Kravar's ability to perform jobs that do not involve heavy lifting establishes, as a matter of law, that she is not disabled.

As required by *Sutton*, Ms. Kravar has proffered evidence from which a jury might rationally conclude that she is unable to perform a broad class of jobs. Specifically, Ms. Kravar has proffered evidence from which a jury could conclude that:

> (1) She is unable to perform cleaning work that involves heavy lifting or vacuuming  (Kravar Depo. 66-67);
>
> (2) Most cleaning jobs are nighttime positions (Def.'s R. 56.1 Stmt. ¶ 66 ("The number of day cleaning positions in Triangle is a very small minority of the cleaning jobs – approximately 5%.")); and
>
> (3) Most nighttime cleaning jobs involve heaving lifting and vacuuming. (Pl.'s R. 56.1 Stmt. ¶ 32 ("The cleaning work at night is more physically demanding [than] the day time work.").)

Putting the premises of this syllogism together, a jury might conclude that Ms. Kravar's physical impairment substantially limits her ability to work, because she cannot perform a broad class of jobs—cleaning positions that involve heavy lifting or vacuuming.  At a minimum, there is a genuine factual dispute as to whether Ms. Kravar is disabled.

### 2. *Accommodation*

The critical question, then, is whether Triangle was obligated to offer Ms. Kravar a daytime position at 731 Lexington Avenue to accommodate her disability.  Triangle contends that it could not offer Ms. Kravar a daytime cleaning position at 731 Lexington Avenue or any other building it served, and that even if there were an opening, "the employees in the buildings would have the right to the job as opposed to [Ms. Kravar]." (Def.'s Opening Br. 19-20.)  Ms. Kravar responds that in fact, she was entitled to a daytime position at 731 Lexington Avenue under the 32BJ Agreement, and thus that Triangle only needed follow its own seniority rules to accommodate her disability.  (Pl.'s Opp. Mem. 13-14.)

While the Court disagrees with Ms. Kravar's understanding of her rights under the 32BJ Agreement—by its terms, the agreement only allows an employee to "bump" a

less senior employee in a building covered by a particular "Building or Route Agreement"—there are significant factual disputes about Triangle's ability to accommodate Ms. Kravar that preclude summary judgment. With respect to Triangle's contention that there were no daytime positions available, it is enough to note that according to Triangle, all cleaning employees at 731 Lexington Avenue were new hires. (Def.'s R. 56.1 Stmt. ¶¶ 25-26.) The employees were only paid 80% of what employees at 110 East 59th Street earned (*id.* ¶ 26), but Ms. Kravar asserts, and Triangle does not dispute, that she offered to work at the lower rate of pay (Pl.'s R. 56.1 Stmt. ¶ 44).

With respect to Triangle's contention that offering Ms. Kravar a daytime position would have violated its seniority rules, Triangle is correct to note that the ADA generally does not require an employer to provide an accommodation that would violate a collective bargaining agreement. *See United States Airways, Inc. v. Barnett*, 535 U.S. 391, 406 (2002). Triangle, however, has failed to demonstrate that offering Ms. Kravar a daytime position at 731 Lexington Avenue would violate the 32BJ Agreement. As already noted, all employees at 731 Lexington Avenue were new hires. And despite Triangle's blanket claims that offering Ms. Kravar a daytime position would violate the 32BJ Agreement, Triangle has not explained how offering Ms. Kravar a daytime position at the new building could violate seniority rights held by employees that had not yet been hired. For these reasons, the Court concludes that at best, Triangle has shown a possibility that offering Ms. Kravar a daytime position would violate its seniority rules, a showing that does not justify summary judgment.

**B.      Title VII Claim**

The Court next turns to Ms. Kravar's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

In this claim, Ms. Kravar contends that Triangle discriminated against her on the basis of her national origin by unlawfully selecting employees to move to 731 Lexington Avenue because they were Hispanic.  (Pl.'s Opp. Mem. 10-12.)  Triangle contends that in fact, *Bloomberg* selected employees for 731 Lexington Avenue, and that it did so because those employees performed so-called "facilities" work, such as setting up conference rooms and moving tables and chairs.  (Heller Aff. ¶ 24.)  Triangle further argues that, based on the evidence in the record, a jury could not reasonably find this explanation a pretext for unlawful discrimination.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e–2.  Because Ms. Kravar has not proffered direct evidence of intentional discrimination, the Court analyzes her claim using the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See generally Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  As relevant here: (1) Ms. Kravar must establish a prima facie case of discrimination; (2) Triangle must then adduce a legitimate, nondiscriminatory reason for its actions; and (3) to prevail, Ms. Kravar must establish that Triangle's articulated reason was a pretext to mask unlawful discrimination.  *See Burdine*, 450 U.S. at 254-56.  Throughout the process, Ms. Kravar carries the ultimate burden of persuasion.  Fed. R. Evid. 301; *see Reeves*, 530 U.S. at 143 ("Although

intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" (quoting *Burdine*, 450 U.S. at 253)).

Assuming without deciding that Ms. Kravar has established a prima facie case of discrimination, the Court finds that Triangle has satisfied its burden under step two of the framework, and that Ms. Kravar has not proffered sufficient evidence of intentional discrimination to support a reasonable conclusion that Triangle unlawfully discriminated against her.  To begin with, there is a significant amount of evidence that Bloomberg selected employees for 731 Lexington, and that its decision was based on the fact that those employees performed facilities work.  Ms. Kravar's union representative, Jeff Abramson, testified that his "understanding of the reason why those employees were allowed to go to the new building even though they were not new hires" was that "Bloomberg requested those employees."  (Abramson Depo. 24, Ex. 21 to Def.'s R. 56.1 Stmt.)  Morry Heller, Triangle's CEO, testified that Bob Ulrich, a senior manager at Bloomberg who was in charge of its facilities group, selected employees for 731 Lexington Avenue "because they knew what it [facilities work] is and how Bloomberg did business and that's what they wanted to continue in this logistical nightmare [of changing buildings]."  (Heller Depo. 52, Ex. 18 to Def.'s R. 56.1 Stmt.)  Avdo Djokovic, Triangle's account manager, testified that two Bloomberg employees, Bob Ulrich and Ron Godse, requested that "everyone in facilities" move to 731 Lexington Avenue "because they knew the job" and because "they were doing facility work for them all over, not just in 110 East 59th . . . ."  (Djokovic Depo. 54-55, Ex. 20 to Pl.'s R. 56.1

- 14 -

Stmt.)  This testimony is not consistent to the last detail, but its thrust is clear:
Bloomberg selected the employees who would move to the new building because they
performed facilities work.

Furthermore, the record contradicts any suggestion that this explanation was
concocted after the fact as a pretext for discrimination.  On November 23, 2004—nine
months before Ms. Kravar was terminated—Morry Heller sent Jeff Abramson a letter
listing the employees that Triangle intended to move to 731 Lexington Avenue.  (*See* Ex.
4 to Def.'s R. 56.1 Stmt.)  The letter noted: "These employees, all day staff, are
considered 'facilities' by Bloomberg and have nothing to do with the cleaning of the
building."  (*Id.*)  On March 17, 2005, Paul Spagnoletti, Triangle's Chief Operating
Officer for the Northeast Region, sent Bloomberg a letter recapping a meeting held
earlier that day.  (*See* Ex. 5 to Def.'s R. 56.1 Stmt.)  It noted:

> In our final bid [for the 731 Lexington Avenue cleaning contract], we had
> made an adjustment, *per Bloomberg's request*, for three (3) "100%" day
> porters from 100 East 59th Street.  Over the course of move-in's and upon
> various requests, the number has subsequently risen to five (5) total
> "100%" workers (The five employees are Jorge Gil, Patrick Rodriguez,
> Eddie Ferris, Bernardo Herasme and Nicholas Rosa) and the addition of a
> "100%" Foreperson (Maria Placencia).

(*Id.* (emphasis added).)

In view of this evidence, Ms. Kravar does not dispute that Bloomberg was largely
responsible for selecting which Triangle employees would move to its new offices.
Indeed, Ms. Kravar concedes that Bloomberg requested that "senior" Triangle employees
move to 731 Lexington to help make the company's transition to its new headquarters
seamless.  (Pl.'s R. 56.1 Stmt. ¶ 20.)  Ms. Kravar nevertheless argues, pointing to three
factual disputes, that summary judgment is inappropriate.  The Court finds that nothing in

these arguments demonstrates a genuine factual dispute over whether Triangle intentionally discriminated against Ms. Kravar because she was not Hispanic.

### 1. The Facilities Workers' Job Function

Ms. Kravar first argues that summary judgment cannot be entered because of a factual dispute concerning the nature of the work the facilities workers performed.  (*See* Pl.'s Opp. Mem. 6.)  Ms. Kravar, for example, testified that contrary to Triangle's representations, she did not think the facilities workers performed "a heavier type of work than what [she was] doing."  (Kravar Depo. 40, Ex. 17 to Def.'s R. 56.1 Stmt.)[5]  She argues on this basis that Triangle could (and should) have offered her a facilities position.

---

[5] For context, this section of Ms. Kravar's deposition reads as follows:

> Q:      Have you ever heard the term facilities work?
> A:      Yes.
> Q:      Were the men doing the facilities work?
> A:      Yes.
> Q:      Is it fair to say that was a heavier type of work than what you were doing?
> A:      I don't think so.
> Q:      It was the same?
> A:      Yeah.
> Q:      Were you doing sweeping?
> A:      No.
> Q:      Were you doing vacuuming?
> A:      No.
> Q:      Were you taking out garbage?
> A:      No.
> Q:      So the men were doing something different than what you were doing?
> MS. STEWART:  So it's not the same.
> A:      Oh, the facility people—how I feel the facility people that were working different jobs like changing the bulbs or—they wasn't really sweeping or taking garbage out.

This testimony does not tend to show that Triangle discriminated in favor of Hispanics.  Rather, it at best shows that Ms. Kravar could perform some but not all of the tasks performed by workers in the facilities position.  Moreover, it appears beyond dispute that Ms. Kravar could not in fact perform the "heavier work" of the men in the facilities positions.  Thus, this factual dispute does not preclude summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

    2.  *Bloomberg's Cuban Employee*

Ms. Kravar next contends that because a Cuban employee was involved in the hiring of workers for 731 Lexington Avenue, a jury could reasonably infer that Triangle intentionally discriminated against her.  (Pl.'s Opp. Mem. 16.)  This contention rests on the testimony of Danuta Stohbach, a fellow Triangle cleaner, who testified that she heard from another cleaner, Maria Placencia, that "Miriam," a Bloomberg employee, was friendly with everyone who spoke Spanish, was involved in selecting employees for Bloomberg's new building, and helped her get a job.  (Strohbach Depo. 27-28, Ex. 11 to Pl.'s R. 56.1 Stmt.[6])  Drawing on this testimony, Ms. Kravar contends that she has

---

> Q:    Okay.  So who was doing the sweeping, vacuuming, mopping and taking the garbage out?
>
> A:    Some of those men.
>
> Q:    The men?
>
> A:    Right.
>
> Q:    Okay.  So I'm just saying the men were doing a different job from what you were doing?
>
> A:    Right.
>
> Q:    And some of the jobs they were doing was heavier work; is that fair to say?
>
> A:    Yes.  Oh, definitely.

(Kravar. Depo. 39-41.)

[6] The relevant section of Ms. Strohbach's testimony reads as follows:

"neutralized" Triangle's nondiscriminatory explanation for why she was not offered a daytime position.

The Court disagrees.  First, the Court has difficulty inferring any discriminatory intent from Ms. Placencia's statements.  Ms. Strohbach's testimony shows only that Ms. Placencia went to Miriam for help getting a job, that Miriam was friendly with her, and that Miriam never talked to Ms. Strohbach or Ms. Kravar.  (Strohbach Depo. 28.)  While the Court accepts that, taken with other evidence, the involvement of an employee who speaks the same language as an employee ultimately selected for a job may support an inference of intentional discrimination, the actions described by Ms. Strohbach hardly support a reasonable inference of race-based cronyism.  Further, if Miriam's

---

Q:     [D]o you know who actually selected the people to work at 731 Lexington?

A:     HR, somebody at Bloomberg.

Q:     Do you know who at HR?

A:     I knew two people, Dan Godsey and this one Cuban lady, Spanish lady.

Q:     Do you know her name?

A:     I think Miriam.  I don't know her last name.

* * *

Q:     How do you know that Ron Godsey or this woman Miriam were responsible for the selection of the employees that could go to 730 Lexington?

A:     Because one of the workers from Triangle [told] me that the lady help[ed] her [t]o get the job.  It was Maria Placencia.

Q:     Maria said that?

A:     Yes.

Q:     Maria Placencia told you what?

A:     She [said] that she [went] to [Miriam for] help get[ting] the job.

Q:     Was Miriam friendly with Maria?

A:     Yes, everybody that speak[s] Spanish and she never talk[s] to me and Eva, the lady.

(Strohbach Depo. 27-28; *see also* Stohbach Aff. ¶ 8 (noting belief that "Miriam" is Marilyn Francisco), Ex. 4 to Pl.'s R. 56.1 Stmt.).)

unfriendliness to Ms. Kravar automatically signaled intentional discrimination, half the professionals in New York City would be in perpetual violation of Title VII.  Miriam, in any event, is an employee of Bloomberg, not Triangle.

Beyond this, Ms. Kravar has not demonstrated that she will be able to offer admissible evidence concerning Maria's involvement in the decision of whom to move to Bloomberg's new headquarters.  "In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).  *See Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (same; party opposing summary judgment may not rely on inadmissible hearsay evidence absent showing that admissible evidence will be available at trial).  Here, Ms. Stohbach's testimony about what Maria Placencia told her would be inadmissible on both on hearsay and personal-knowledge grounds, *see* Fed. R. Evid. 602, 802, and Ms. Kravar has made no showing that admissible evidence is available to take its place.  The putative involvement of a Cuban employee in deciding whom to move to 731 Lexington Avenue does not preclude summary judgment.

### 3. Triangle's "Rating and Ranking" Process

Finally, Ms. Kravar contends that summary judgment cannot be entered because Triangle was involved in a "rating and ranking" process used to determine which employees would be moved to the new building.  (*See* Pl.'s Opp. Mem. 15-16.)  While Triangle contends that Bloomberg alone select employees for Bloomberg's new building, Ms. Kravar contends, pointing to a five-line spreadsheet entitled "Possible Keeps," that

Triangle was actually involved in the selection of employees for Bloomberg's new offices.  (*See* Ex. 9 to Pl.'s  R. 56.1 Stmt.)  Ms. Kravar offers no testimony or other evidence of who prepared the spreadsheet or what information it attempts to convey.

Although the Court has doubts about what the spreadsheet shows, any dispute about who selected employees for Bloomberg's new building is immaterial to the question of whether Ms. Kravar was the victim of intentional discrimination.  In view of the abundant evidence that Bloomberg selected workers for 731 Lexington Avenue because they performed facilities work, the evidence proffered by Ms. Kravar—namely, the assignment of six Hispanic employees to the new building, Ms. Kravar's account of the facilities workers' job responsibilities, and the involvement of a Spanish-speaking woman in Bloomberg's selection process—does not support a reasonable conclusion that Triangle intentionally discriminated against Ms. Kravar.  Since the selection process was innocuous, Triangle's involvement in it, if any, does not support a claim for unlawful discrimination.

**C.      Retaliation Claim**

Finally, the Court turns to Ms. Kravar's retaliation claim.  In this claim, Ms. Kravar contends that although she had no legal right to remain on Triangle's payroll or to continue receiving benefits after September 2005, Triangle retaliated against her in November 2005 by cutting off her pay and benefits.  (Pl.'s Mem. 19.)  The Court is unaware of, and Ms. Kravar has not cited, any decision where a plaintiff-employee established a prima facie case of retaliation based on an employer's termination of benefits the employee had no legal entitlement to.  While Ms. Kravar may well have had a viable claim of retaliation if she was a Triangle employee after September 2005, the fact that she was not precludes her retaliation claim.

## III.   CONCLUSION

Triangle's motion for summary judgment [33] is denied as to Ms. Kravar's disability discrimination claims, but granted in all other respects. The parties are directed to submit a joint pretrial order within thirty days.

SO ORDERED.

Dated: New York, New York
      March 27, 2009

Richard J. Holwell
United States District Judge